### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| VALERIE C. ELLIOTT, | **:** | |
| | **:** | |
| v. | **:** | |
| | **:** | Civil Action No. CCB-05-2867 |
| MARYLAND DEPARTMENT OF HUMAN | **:** | |
| RESOURCES, et al. | **:** | |

...o0o...

### MEMORANDUM

Valerie Elliott ("Elliott") filed this suit against the Maryland Department of Human

Resources and Dorchester County Department of Social Services alleging discrimination based

on race in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.* Specifically,

Elliott alleges that her employers condoned a hostile work environment and discriminated and

retaliated against her. The defendants filed a motion for summary judgment on all counts. The

matter has been fully briefed and no hearing is necessary. *See* Local Rule 105.6. For the reasons

stated below, defendants' motion for summary judgment will be granted.

### BACKGROUND

Plaintiff Valerie Elliott, an African-American woman, began her career with the

Maryland Department of Human Resources in 1978 and was transferred to the Dorchester

County Department of Social Services ("DCDSS") in 1997 to fill the position of Assistant

Director of the Family Investment Program ("FIP"). She was picked for the position by Bill

McDonnell, the Director of DCDSS, and defendants allege that McDonnell picked Elliott over

her co-equal supervisor, a white male. (Def.'s Mem. at Ex. 28, Elliott Tr. at 66, 70.) Elliott's

duties as Assistant Director included management of the FIP staff (about 25 persons), case

review, and policy interpretation. Prior to 2000, Elliott described her working conditions and her

relationship with her supervisor as "fine" and "okay."  (*Id.* at 82-87.)

In 2000, Elliott's working conditions began to change.  Elliott claims that in 2000,

Barbara Windsor, a subordinate of Elliott's, began making racially derogatory comments about

her outside of the workplace.  (Pl.'s Opp. Mem. at Ex. 2, Elliott Tr. at 263.)  Elliott testified that

she believed Windsor's dislike was due, at least in part, to Elliott's relationship with her

boyfriend, Ernest Haynes.  (Def.'s Mem. at Ex. 28, Elliott Tr. at 227-28.)  Elliott testified that

another co-worker, Kathy Cornish, an African-American woman, also was jealous of Elliott's

relationship with Haynes.  Elliott claims that Victoria Stanley, Deputy Director of the FIP unit

and Elliott's immediate supervisor, was aware of Windsor's comments, as well as similar

comments made outside of the workplace by Wanda Creighton, another DCDSS employee under

Elliott's supervision.  (Pl.'s Opp. Mem. at Ex. 2, Elliott Tr. at 261-63.)

The issues between Elliott and her subordinates came to a head in the summer of 2001

when Cornish, Windsor, and Creighton made allegations of harassment against Elliott.  On

September 12, 2001, Elliott wrote to the Director of the FIP unit, William McDonnell, requesting

a meeting to discuss the treatment of Cornish, Windsor, and Creighton by Elliott.  In a meeting

on September 13, 2001, McDonnell, Stanley, Windsor, Creighton, Cornish, and Elliott sat down

and discussed their issues.  Elliott's subordinates did not feel they were being treated respectfully

and disagreed with the corrective action plans that Elliott had created for them.  (Def.'s Mem. at

Ex. 28, Elliott Tr. at 154.)  During this meeting, McDonnell told Elliott that she was perceived as

self-righteous and arrogant and that Elliott should "come down off of her throne."  (*Id.* at 263,

269-70.)  The meeting was productive, and Elliott testified that the matter was basically resolved

to her satisfaction at the time.  (*Id.* at 168.)

2

Elliott's problems with her subordinates did not end, however.  In November 2001, Elliott received a counseling memorandum from Stanley for intervening in a performance evaluation of Cornish written by Elliott's assistant in the FIP unit, Carol Bryan.[1]  In this counseling memorandum, Stanley advised Elliott that "[i]t is important now to work to repair a breakdown in communication among members of your staff." Stanley noted that "McDonnell made five points [in the September 13 meeting] I think bear repeating: hear the words of staff; rigidity is built into FIP - not in treatment of staff; dignity and respect is expected for each other; equal treatment for all; and staff deserve not to be talked down to."  (Def.'s Mem. at Ex. 6.) Elliott refused to sign acknowledging receipt of the memorandum although Stanley noted that this memorandum would be placed in her personnel file.

Cornish, Windsor, and Creighton were not the only personnel in the FIP unit that had problems with Elliott.  Ruthie Hughes, another worker under Elliott's supervision, complained about Elliott's treatment of her; Elliott guessed that the complaints had to do with Elliott singling Hughes out for discipline.  (Def.'s Mem. at Ex. 28, Elliott Dep. at 208-09.)  Elliott also became aware that Carol Burton and Steve Brohawn, other subordinates of Elliott's, approached McDonnell or Stanley with complaints about Elliott, though Elliott felt that none of the complaints had any merit.  (*Id.* at 211, 214.)  Nonetheless, Bryan testified that: "[t]here was a lot of tension, a lot of tension with the staff because they, they sensed what was going on" and described Elliott's demeanor as angry.  Bryan testified that when something made Elliott upset "she would go in and slam the door to her office, and everyone knew it."  (Def.'s Mem. at Ex.

---

[1]Elliott directed that Bryan note that Cornish had a "communication issue" with Elliott. (Def.'s Mem. at Ex. 6.)

25, Bryan Dep. at 29-30.)

The DCDSS workplace began to suffer from some racial incidents in 2003.  On April 1, 2003, one of Elliott's supervisors, Deborah Conaway, received an anonymous letter from a "concerned citizen" who reported that Windsor referred to Conaway outside of the workplace as the "n" and that Windsor stated that she was going to get the "n."  (Def.'s Mem. at Ex. 7.)  On July 25, 2003, in the DCDSS lunchroom, a DCDSS employee named Terry Culver (who did not work in the FIP unit) used a racial epithet in a conversation with co-workers, including Karen Dennis and Kathy Cornish, who are both African-American.  In response Carolyn Harding, DCDSS's Assistant Director of Administration, held a meeting attended by Dennis, Cornish, Culver, and Elliott on July 28, 2003 to address the incident.  (*Id.* at Ex. 8.)  Stanley and Harding suggested that Culver apologize promptly to each person who heard the comment, which Culver did.  Of the people that heard the remark, Cornish did not want the apology, Dennis reported that she would need time to get over the incident, and the rest at the table accepted the apology.  (*Id.*) A Letter of Direction was placed in Culver's file, and Elliott reported being generally satisfied with the handling of the Culver incident, though she believed that Culver should have received a Counseling Memorandum.  (*Id.* at Ex. 28, Elliott Dep. at 290-96.)

The response to the Culver incident apparently further created racial tensions.  On September 16, 2003, Harding received a note from "The Caucasian Workers of DSS" stating: that the Culver incident was being used by "the blacks to start something"; that "FIP is mostly black and therefore want to see SOMETHING happen"; that the agency is leaning toward the blacks and not being concerned with the whites; that Elliott treats white employees differently than she "treats the blacks"; that "Valerie does not even acknowledge" the white employees in

the office; and that "Vicky [Stanley] is seen as a silent troublemaker" who also treats white people differently from black people. (*Id.* at Ex. 10.)  The letter went on to state that:

> "we feel that no one listens and no one cares because the majority here are black and when we go to our management, they are black, the Deputy Director is black.  So where can we go.  The Teri incident just reinforces that we have no one to talk to because they take things personal want to GET HER OUT.  NO MATTER WHAT. You may say that everything is equal, but if that's true, why have they blown this out of the water.  Why are we paying for how the blacks were treated 100 years ago."

(*Id.*) (emphasis in original)  The letter was signed "Disgusted - The Caucasian Workers of DSS."

On that same date, Christopher McCabe, Secretary of DHR, received an anonymous letter from a "concerned employee" outlining many of the same issues listed in the "Caucasian Workers" letter.  This letter alleged "racial problems involving 2 top leadership. Valerie Elliott - FIP Assistant Director and Victoria Stanley - Deputy Director. ...  Valerie is nitpicking a few whites in her unit to the point that they are now becoming not as productive employees." (*Id.* at Ex. 11.)  The letter also claims that "Vicky is fanning the fire and this group sees her as their Martin Luther King of DSS. ... The slogan 'we will overcome' is being chanted amongst their isolated group and I think it is sickening." (*Id.*)

Secretary McCabe forwarded the documents to DHR's Office of Employment and Program Equity ("OEPE"), which began an investigation.  On October 7 and October 13, the Deputy Director of OEPE, Carl Bailey, traveled to Cambridge, Maryland to interview employees, including Elliott, Hughes, Dennis, Harding, Conaway, Cornish, and Brohawn about the racial problems at DCDSS. (*Id.* at Ex. 12, Bailey Aff. at ¶ 4.)  In these interviews, Bailey spoke with Elliott for about an hour and Elliott related the problems she saw at DCDSS including issues related to problems with case management in her unit.

Bailey's investigation revealed, among other things, "that employee morale at the FIP

unit of DCDSS was very low and that a number of African American and Caucasian employees

in the unit were troubled by what they regarded as Valerie Elliott's heavy-handed style of

managing the unit." (*Id.* at ¶ 6.)  Bailey made two recommendations at the end of his

investigation.  First, he recommended to Secretary McCabe and Director McDonnell that "all

DCDSS employees be provided with mandatory, intensive cultural sensitivity training ... and the

retention of a facilitator to conduct "team-building" training for DCDSS employees." (*Id.* at ¶

9.)  Second, McCabe recommended to McDonnell and Stanley "that they work closely with

Valerie Elliott to improve her supervisory and management skills, particularly her ability to

interact effectively with her subordinates in the FIP unit." (*Id.* at ¶ 10.)

McDonnell accepted Bailey's recommendations.  McDonnell hired a consultant to

provide the cultural sensitivity training, who conducted focus groups and provided the

mandatory sensitivity training to all DCDSS employees.  Secretary McCabe also sent a

memorandum to all DCDSS employees in which he stated he would not tolerate "acts that defy

State and DHR policy on Non-Discrimination and Harassment." (*Id.* at Ex. 15.)  McCabe sent his

Chief of Staff, Byron Harris, and other DHR officials to address the staff of the DCDSS

regarding the Non-Discrimination and Harassment Policy.  The group met first with Elliott's FIP

unit, and then met with the entire agency.  Elliott reports that, among other things, the DHR

officials made clear that there would be zero tolerance for discrimination or harassment.  While

no further racial epithets were reported in the workplace, Elliott felt that bad feelings lingered

over the incidents in the office.

McDonnell also attempted to follow through on Bailey's recommendation regarding

Elliott.  On October 17, 2003, Elliott met with McDonnell and Stanley to discuss the continuing

morale problems in the FIP unit.  (Def.'s Mem. at Ex. 28, Elliott Dep. at 340-41.)  The three

discussed a memorandum created by Stanley titled "Next Steps - Valerie Elliott."  (Def.'s Mem.

at Ex. 17.)  The document summarized the problems that Elliott was having with many of her

subordinates and noted:

> I see defensiveness, anger and sometimes I can see you just **shut down**, when something
> is said that you just don't like.  If Bill [McDonnell] pressures you to address them, the
> attitude is disturbing.  It seems you get easily upset and verbally not easy to talk to when
> questioned.  How can we address issues and do something to stop the problems you
> identify if you shut us down and out?  Do you see your role in the breakdown in our
> communication?"

(*Id.*) (emphasis in original)  The memorandum also criticized Elliott for allowing "your

personnel [sic] feeling [to] overrule your professional judgment..."  (*Id.*)

That October 17 meeting did not go well from the perspectives of Elliott or McDonnell

and Stanley.  Elliott believed that she was blamed unfairly for the problems in her unit and felt

that she was not getting the support necessary from McDonnell and Stanley.  She also felt that

the problems in the unit were due to her subordinates and superiors and not any behavior on her

part.  In response to her frustration, McDonnell suggested that "maybe you should get your

resume ready and look elsewhere." (Def.'s Mem. at Ex. 28, Elliott Dep. at 369.)  McDonnell also

stated that if Elliott "couldn't operate the unit the way he wanted it operated, then he would

make a suggestion to the Secretary."  The three scheduled another meeting for October 27, 2003,

where a revised management action plan would be drafted by the three parties.

At the October 27 meeting, McDonnell produced a revised management action plan.  The

document stated that the morale in the FIP division has been deteriorating for some time, due

primarily to: "The stress of increased workloads; The perception that FIP management is rigid

and heavy-handed; and The perception of white employees that they are treated differently than

blacks - that black employees receive preferential treatment and white employees are singled out

for disciplinary action." (*Id.* at Ex. 18.)  The document listed several steps Elliott should take to

build a sense of harmony and teamwork, including establishing an open door policy, increasing

formal and informal interaction with staff, chairing division staff meetings, preparing a statement

to the employees of the FIP staff, and reducing the "heavy-handedness" of the unit.  (*Id.*)

McDonnell felt that Elliott refused to take responsibility for the morale problems in the Unit and

was dismissive of the action plan, stating that she was already doing the things proposed in the

action plan.  (*Id.* at Ex. 14, McDonnell Aff. at ¶ 10.)

On October 29, McDonnell submitted a slightly revised Management Action Plan for

Elliott with more specific recommendations on how to improve her performance.  (*Id.* at Ex. 19.)

Elliott responded by e-mail that she had "reviewed the management action plan, however, I take

exception to how the plan is written.  I feel I am and have been doing what is outlined in the plan

with the exception of the Item D [chairing her own staff meetings.]" (*Id.* at Ex. 28, Elliott Dep. at

385-87.)  McDonnell submitted a third revised plan on October 30, which was similar in form

and content to the previous two drafts, but included Elliott's supervisors in the action plan.  (*Id.*

at Ex. 20.)  A fourth and final plan was submitted on November 17.  Elliott continued to

maintain that she was doing everything in the plan except having lunch with her staff and

chairing her own meetings.

Citing the lack of improvement of morale and work atmosphere and lack of enthusiasm

for the Management Actions Plans, McDonnell stated that he felt he had no choice but to remove

Elliott from her position on November 20, 2003.  (*Id.* at Ex. 14, McDonnell Aff. at ¶ ¶ 12-13.)

When Elliott asked McDonnell why she was fired, McDonnell told her only that she was an at-

will employee.  (*Id.* at Ex. 28, Elliott Dep. at 414-15.)  On November 24, 2003, the duties held

by Elliott as Assistant Director of FIP were transferred to Stanley, who is an African-American

female.  (*Id.* at Ex. 21.)

Elliott appealed her dismissal, and the termination was upheld at the administrative level.

Elliott filed a timely charge of discrimination with the Maryland Commission on Human

Relations on May 27, 2004, and with the EEOC on July 27, 2004.  The EEOC issued a Right to

Sue letter on July 20, 2005, and Elliott's original complaint was timely filed on October 20,

2005. Elliott amended her complaint in January 2006 alleging three counts of racial

discrimination in the form of discriminatory discharge, retaliation, and hostile work

environment.  Defendants filed this motion for summary judgment in October 2006.

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified this does not mean that any factual dispute will defeat the

motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## I.  Discriminatory Discharge

Under Title VII, it is an unlawful employment practice "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Elliott has not, however, presented any direct evidence of employment discrimination by the defendants.  Thus, her Title VII claims will be analyzed under the burden shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See, e.g., Kess v. Mun. Employees Credit Union, Inc.*, 319 F. Supp. 2d 637, 644 (D. Md. 2004).  Under this test, a plaintiff must first establish, by a preponderance of the evidence, a prima facie case of discrimination.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).  To do so, a

plaintiff must generally show: (1) she is a member of a protected class; (2) she was performing

her duties in a satisfactory manner; (3) she was subjected to an adverse employment action; and

(4) circumstances surrounding the adverse employment action support an inference of

discriminatory intent. *Chika v. Planning Research Corp.*, 179 F. Supp. 2d 575, 581 (D. Md.

2002).

      If the plaintiff establishes a prima facie case, the burden then shifts to the employer to

produce evidence that the employment decision was made for legitimate nondiscriminatory

reasons. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Once the

employer articulates a nondiscriminatory explanation for its decision, the plaintiff must prove by

a preponderance of the evidence that the defendant's proffered reasons were merely pretext for

discrimination. *See Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 142-43 (2000). The

prima facie case, combined with sufficient evidence to find that the employer's asserted

justification is false, may permit the trier of fact to conclude that the employer unlawfully

discriminated, but may not always be adequate to sustain a jury's finding of liability. *Id* at 148.

      Defendants allege that Elliott cannot make out a *prima facie* of discrimination because

after her termination, Elliott's responsibilities were ultimately filled by another African-

American woman. While the Fourth Circuit has not created a hard and fast rule, it has held that

"[i]n order to make out a *prima facie* case of discriminatory termination, a plaintiff must

ordinarily show that the position ultimately was filled by someone not a member of the protected

class." *Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998). When Elliott was terminated from

her position as the Assistant Director of the FIP program, she was not replaced by another

employee. Rather, the position's responsibilities were filled by Victoria Stanley, the Deputy

11

Director of the FIP unit, an African-American woman.  Elliott argues that because the position

was not filled by a new hire, the ordinary rule of *Brown* does not apply.

I agree with Elliott that it is not always necessary for a plaintiff to show that her position

ultimately was filled by someone outside of her protected class.  Indeed, in a case where a

terminated position was not filled and the position's responsibilities were dispersed among

several workers in an office, it would be impossible for a plaintiff to make out the fourth prong

of a *prima facie* case.  *See e.g. Glunt v. GES Exposition Services,* 123 F. Supp. 2d 847, 865-68

(D. Md. 2000) (holding that, where plaintiff's position was not filled by a new replacement,

plaintiff can still make a prima facie case by providing other evidence giving rise to a reasonable

inference of discrimination); *Al-Hashimi v. Scott*, 756 F. Supp. 1567, 1579 (S.D. Ga. 1991)

("The defendant argues that since no new faculty member was hired, the plaintiff's position has

not been 'filled' by anyone.  The Court agrees with the plaintiff that this technicality should not

be used to circumvent the plaintiff's rights under the statute").  Accordingly, the fact that

Elliott's position was not filled by a new hire does not defeat her attempt to satisfy the fourth

prong of the *McDonnell Douglas* test.  The flip side of the coin is also true, however; Elliott

cannot use the fact that her position was not filled as an inference that the defendants

discriminated against her.  Indeed, the fact that the defendants had Elliott's responsibilities

assumed by an African-American tends to undercut any inference of discrimination that would

be raised by the failure of the defendants to fill Elliott's position.

Assuming without deciding that the circumstances surrounding Elliott's termination are

sufficient to make out a *prima facie* claim of disparate treatment, Elliott's case nevertheless fails

because she has presented no evidence suggesting that the defendants' reasons for her

12

termination were merely pretextual.  The defendants stated that their reason for firing Elliott was

the lack of improvement of morale in the FIP unit and Elliott's unwillingness to comply with her

Management Action Plans.  In support of its argument, the defendants presented the court with

evidence dating back to 2001 that her subordinates were unhappy with Elliott's management

style.  Both her assistant in the FIP unit, Carol Bryan, and the DHR Chief of Staff, Carl Bailey,

testified that they observed low morale in the FIP unit.  Several of her subordinates filed

complaints, beginning in 2001, about Elliott with McDonnell and Stanley, citing Elliott's heavy-

handedness.  After McDonnell and Stanley were dissatisfied with Elliott's response to the Culver

incident and the "Caucasian Workers" memorandum, McDonnell created a series of

Management Action Plans for Elliott.  Instead of adopting the recommendations, the defendants

claim that Elliott ignored them.  Accordingly, Elliott was fired.

Elliott has produced no evidence to meet her burden to show that the defendants' reasons

were pretextual.  Elliott's opposition recognizes that to prove pretext, a plaintiff may either

provide evidence that the defendants' "explanation is unworthy of credence or by offering other

forms of circumstantial evidence sufficiently probative of [retaliation]." *Price v. Thompson*, 380

F.3d 209, 212 (4th Cir. 2004) (citations omitted).  Here, Elliott has offered neither.  Elliott does

not dispute that her supervisors, her subordinates, and an outside observer (the DHR Chief of

Staff) all observed low morale and all attributed the problems, in part, to Elliott.  The problems

with Elliott began in 2001, and the morale of the FIP unit had been deteriorating since then.

Indeed, Elliott was aware that her superiors were unhappy with her performance, testifying that

they thought "that my staff's morale is low, that I'm not being a team leader, a whole lot of

things" and that she simply did not agree with her supervisors on fundamental matters about how

to manage the FIP unit and who was responsible for the morale problems in that unit.  (*Id.* at Ex.

28, Elliott Dep. at 302-03.)  While Elliott may believe that she was discriminated against, her

subjective belief of discrimination without further proof of pretext is insufficient to defeat a

motion for summary judgment.  *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 459 (4th Cir. 1989)

("we have recognized that generalized testimony by an employee regarding his subjective belief

that his discharge was the result of ... discrimination is insufficient to make an issue for the jury

in the face of proof showing an adequate, nondiscriminatory reason for his discharge.") (citations

omitted).  Accordingly, judgment will be granted for the defendants on the plaintiff's

discriminatory discharge claim.

### II.  Retaliation

In her amended complaint, Elliott alleges that "[t]he creation, imposition and

enforcement of the document entitled "Next Steps - Valerie Elliott" and termination of Plaintiff

were retaliatory actions made in direct response to Plaintiff's complaints about the

discrimination suffered by her and the African American employees that worked under her."

(Am. Compl. at ¶ 37.)  Title VII's anti-retaliation provision forbids discrimination against

employees who have opposed any practice made unlawful by Title VII or who have "made a

charge, testified, assisted, or participated" in a Title VII "investigation proceeding or hearing."

42 U.S.C. 2000e-3(a).  Thus, to state a *prima facie* case of retaliation, Elliott must show: 1) she

engaged in protected activity; 2) defendants took an adverse employment action against her; and

3) a causal connection existed between the protected activity and the employment action.  *Von*

*Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001).  As with a substantive discrimination

claim, if the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the

defendant to demonstrate a legitimate nondiscriminatory reason for its action.  To survive

summary judgment, the plaintiff must present evidence from which a juror could conclude by a

preponderance of the evidence that the employer's proffered reasons are pretext for intentional

retaliation.

Protected activities fall into two categories: participation in a protected activity or

voicing opposition to an employer's discriminatory activities.  *EEOC v. Navy Fed. Credit Union*,

424 F.3d 397, 406 (4th Cir. 2005).  Here, Elliott argues "[s]taging informal protests and voicing

her opinions was exactly what plaintiff did by complaining to her supervisors about being

offended by the use of racial epithets."  (Pl.'s Opp. Mem. at 13.)  Elliott argues that, between

2000 and 2003, she made clear to her supervisors that she was offended by the use of racial

epithets.  Elliott claims this led to the intermediate adverse employment action of the "Next

Steps - Valerie Elliott" documents created in 2003 and ultimately to her firing in November

2003.

Assuming without deciding that Elliott stated a *prima facie* claim, she has provided no

specific evidence to show that the defendants' stated reasons for firing her were pretextual, and

thus, Elliott has not proved the casual link necessary between her informal complaints to her

supervisors and her later firing.  Instead of ignoring plaintiff's complaints about the racial

epithets, defendants took concrete steps to try to remedy the situation.  In 2001, Elliott's

supervisors arranged for a meeting between Elliott and the subordinates she claimed were using

racial epithets outside of the workplace.  In her deposition, Elliott testified that she was satisfied

with the results of that 2001 meeting and McDonnell's eventual response to Elliott's complaints.

(*Id.* at Ex. 28, Elliott Dep. at 166-68.)  In 2003, after the Culver incident and the "Caucasian

Workers" e-mail, the defendants again attempted to respond to the racial problems in the

workplace.  The Department sent a professional to do office-wide sensitivity training and

announced a zero-tolerance policy with regard to discrimination.  Elliott again testified that she

was generally satisfied with the agency's handling of the Culver incident (though she thought a

permanent letter should have been placed in Culver's file) and that she had put the incident

behind her.  (*Id.* at 290-96.)

The evidence does not suggest that plaintiff's Management Action Plans were created

due to her complaints of racial discrimination; instead, they appear to have been a direct

response to Carl Bailey's recommendation that Elliott work on her supervisory skills.  (*Id.* at Ex.

14, McDonnell Aff. at ¶ ¶ 7-9.)  After Elliott did not appear willing to comply with the

Management Action Plans and after numerous complaints about Elliott from her subordinates in

the FIP unit, defendants terminated her.  As Elliott has produced no specific evidence to rebut

defendants' assertion that they fired her because she was a poor supervisor, defendants' motion

for summary judgment as to the retaliation claim will be granted.

### III.  Hostile Work Environment

Under Fourth Circuit law, to succeed on a claim for a racially hostile work environment,

the employee must show that the harassment was: 1) unwelcome, 2) based on race, 3)

sufficiently severe or pervasive to alter the conditions of employment, and 4) there was some

basis for imposing liability on the employer. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179,

183-84 (4th Cir. 2001).  The harassment must be both objectively and subjectively severe and

pervasive.  *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993).  In determining whether conduct

is sufficiently severe and pervasive, the courts look to the "totality of the circumstances,"

including 1) the frequency of the discriminatory conduct, 2) the severity of the conduct, 3) whether the conduct was physically threatening, humiliating, or a mere offensive utterance, and 4) whether it unreasonably interferes with an employee's work performance. *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998).

Here, Elliott appears to base her claim for hostile work environment on a few specific events: 1) the allegations of racial epithets made outside of the workplace in 2001, 2) the Culver incident, where the word "nigger" was used by an employee outside of the FIP unit in 2003, 3) the "Caucasian Workers" email, where the writers noted that Elliott treated white employees worse than black employees in 2003, and the 4) anonymous letter by a concerned employee in 2003, noting that "[Elliott] is nitpicking a few whites in her unit to the point that they are now becoming not as productive employees." These events do not demonstrate "harassment" sufficiently severe or pervasive to constitute a hostile work environment.

Most of the alleged racial utterances occurred outside of the workplace, and Elliott did not personally hear any of the racial epithets allegedly uttered by employees of DHR. Terry Culver's incident was the single time Elliott reports that a racial epithet was actually used in the workplace, and Elliott was not present at the time of the incident. Culver's use of the "n" word was not made in reference to Elliott, or any other employee in the workplace. While the use of the word is never to be condoned and is clearly harmful, there is no evidence that Elliott actually heard or had the word directed at her personally. Nor were epithets used on a frequent basis over the 2001-2003 time period. *See White v. BFI Waste Services, LLC*, 375 F.3d 288, 298 (4th Cir. 2004) (frequent use of racial epithets were sufficiently severe or pervasive to create hostile work environment).

Inquiry into the severity and pervasiveness of discrimination includes both an objective and a subjective component.  In order to satisfy the subjective component, a plaintiff must "demonstrate that the harassment interfered with her ability to perform her work or significantly affected her psychological well-being." *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir. 1989).  The epithets and anonymous letters did not appear to affect Elliott's work performance. In her deposition, when asked whether her performance level was affected by what was going on around her at the DSS, Elliott testified: "I thought I was doing a good job.  I mean, I was performing to the best of my ability."  (*Id.* at Ex. 28, Elliott Dep. at 445.)  Elliott does not allege that she suffered any medical problems attributable to the harassment.  (*Id.* at 451.)  *See, e.g., Spriggs*, 242 F.3d at 185-86 (holding that hostile work environment existed, in part, because defendant's behavior "affected [plaintiff's] emotional health and self esteem and interfered with [his] ability to concentrate on [his] work and effectively interact with [his] customers.")  Further, neither the anonymous letters nor the racial epithets (made outside of plaintiff's hearing) were physically threatening in any way.  Taken as a whole, the harassment is neither severe nor pervasive enough to constitute a valid claim under Fourth Circuit law.  *Compare Spriggs*, 242 F.3d at 185-86 (holding that the almost daily insulting of plaintiff and other African-Americans by using the "n" word, "monkey", and other racial epithets was sufficiently severe or pervasive (or both) to constitute a hostile work environment) *with Faragher*, 524 U.S. at 786-87 (1998) (citing multiple cases for proposition that mere utterances of an ethnic or racial epithet which engenders offensive feelings in an employee do not sufficiently alter terms and conditions of employment).

Elliott's evidence imputing liability to defendants is also weak.  Here, the harassment

was done by co-workers and not by Elliott's supervisors.  Accordingly, to impute liability to

defendants, Elliott would need to produce evidence that defendants knew or should have known

about the harassment and did not take reasonable steps to prevent or correct the harassment.  *See,*

*e.g., Mikels v. City of Durham*, *N.C.*, 183 F.3d 323, 329-30 and n.4 (4th Cir. 1999) (holding that

defendant's remedial response was sufficiently "prompt and adequate" precluding imputation of

liability).  There is no question here that the defendants knew about the incidents involving the

racial epithets and the anonymous letters, so the only question is whether the defendants'

response was adequate.  As described above, the defendants responded promptly to each incident

and involved Elliott in the follow-up to each of the incidents.  After the alleged epithets made

outside of the workplace, the defendants arranged for a meeting between the parties to work out

their differences; Elliott responded that she was satisfied with the response at the time.  After the

Culver incident and the anonymous letters, the defendants instituted office-wide sensitivity

training and emphasized their zero-tolerance policy of discrimination; again Elliott reported she

was generally satisfied with the response.  The defendants' efforts to remedy any harassment

occurring in the unit defeat Elliott's attempts to impute liability to the defendants for her co-

workers' harassment.

Accordingly, because the harassment was not severe or pervasive, and liability cannot

properly be imputed to the defendants, Elliott can not prevail on her claim for a hostile work

environment.

A separate order follows.

  February 22, 2007                                                    /s/
Date                                                Catherine C. Blake
                                                    United States District Judge